THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY GLASS, Defendant-Appellant.

First District (6th Division)   No. 1—90—1310

Opinion filed July 10, 1992.

Michael H. Cole & Associates, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Janet Mahoney, and Theresa Harney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Henry Glass was convicted of first degree murder and sentenced to 25 years in prison. On appeal he contends the indictment against him was improperly amended, the State violated discovery requirements and the judge improperly denied his motions to appoint an ex-

138

pert witness, to suppress incriminating statements he made and to grant his request for new counsel.

On appeal defendant poses these issues: (1) whether the indictment was properly amended prior to trial; (2) whether the State violated its duty to tender discovery prior to trial; (3) whether the trial judge erred in denying defendant's motion to suppress statements; (4) whether defendant effectively waived his *Miranda* rights; (5) whether the trial judge erred in denying the appellant's motion for substitution of counsel; (6) whether defendant's trial counsel properly assisted defendant with his burden of production; (7) whether the trial judge erred in denying defendant's motion for an expert witness; and (8) whether defendant and his court-appointed attorney had a conflict of interest prior to the commencement of trial.

Defendant Henry Glass was arrested and charged with murdering his common-law wife, Kim Blanchard, in their apartment in Chicago. On January 6, 1989, defendant was indicted on two counts of first degree murder for beating Kim Blanchard "with his fists." The indictment was amended without objection from the defense on the first day of trial to omit the reference to "fists." Before trial, defendant filed a motion to suppress statements he had made to police and an assistant State's Attorney.

### PRETRIAL SUPPRESSION HEARING

Testimony on the motion to suppress was heard over two days, August 17 and September 22.

Detective John Santopadre testified that on December 8, 1988, he and Detective Mohan spoke with the defendant at approximately 11 p.m. at the police station. He testified that defendant was given his *Miranda* rights from a preprinted card, defendant acknowledged each right he had and then defendant chose to speak with the officers.

He testified that he phoned an assistant State's Attorney and received the results of an autopsy report before speaking with defendant again at 7 or 7:15 p.m. on December 9. With Mohan present, defendant was read his *Miranda* rights and defendant responded "Yes, I do" after he was asked if he understood each right. Santopadre testified that after defendant was informed of the autopsy report he chose to make another statement.

Santopadre testified that, at approximately 8 p.m., Assistant State's Attorney Mary Beth Kinnerk arrived, read defendant his *Miranda* rights and then took a statement from defendant while he and Mohan were present. Santopadre testified that the three left defendant in the room for a short time, and when they returned, Kin-

nerk repeated the *Miranda* rights to defendant and then gave him a written statement that was a summary of his statement to her.

Santopadre testified that the defendant read the statement very slowly and if he needed help with a word he was helped. The defendant made changes to the statement at will. Santopadre and Kinnerk signed and initialed each page of the statement. The defendant signed the statement after initialing changes he made. The statement was admitted into evidence.

Santopadre testified that defendant's responses were easily understood and that defendant did not slur his speech. He testified that defendant did not appear to be suffering from the effects of cocaine withdrawal. He admitted that the defendant stated that he was tired and high on December 8 but that the defendant did not appear to have any difficulty answering questions.

He denied that Kinnerk threatened the defendant in any way, specifically denying that defendant was threatened with the death penalty or with a beating by police officers. He admitted that either on December 8 or 9 the defendant told him "something about going downstairs and getting high with a neighbor or outside and getting high or buying some wine or something like that."

Detective Joseph Mohan testified to the same events on December 8 and 9. He admitted that the defendant told him on December 8 that he had gotten high earlier in the day and had something to drink right before the police came to pick him up. He admitted that he was not present when Santopadre, Kinnerk and the defendant signed the statement but he was in the room when the defendant read the statement out loud.

Assistant State's Attorney Mary Beth Kinnerk testified that she interviewed defendant after reading him his *Miranda* rights. She testified that defendant was articulate and did not appear to be under the influence of either alcohol or drugs. She testified that she reduced their conversation to writing and then the defendant made corrections to it before signing the statement. She denied making any threats to the defendant and commented that there was a portion of defendant's statement that he signed that said he had not been threatened and that he had been given a sandwich, lasagna, french fries and coffee and was allowed to use the bathroom. She admitted that he confessed to having consumed a bottle of brandy in the five hours between Blanchard's death and his arrest, 24 hours before she interviewed him.

The defendant testified that he drank a liter of brandy and consumed about 3½ ounces of cocaine the day of his arrest, December 8. He testified that he was awakened by police at about 6 p.m. and

handcuffed. He testified that he told police he wished to have a lawyer present. He testifed that he was was "jittery and drowsy and confused" at the time he was put in the lockup. He testified that he was never given his *Miranda* rights by police or the assistant State's Attorney. He testified that Kinnerk told him if his statements did not please her she "would see to it that I would get a life sentence or the death penalty." He testified that she also threatened to have police officers beat him up.

On cross-examination he testified that he started drinking and consuming drugs at approximately 8 p.m. on December 7, 24 hours prior to his arrest.

The trial judge denied defendant's motion to suppress statements he made to police finding that defendant was under no physical impairment or coercion at the time the statements were made. The judge found that, weighing the credibility of the witnesses, the defendant made a free, voluntary and intelligent waiver of his *Miranda* rights before making a statement to police.

## PRETRIAL MOTION FOR NEW ATTORNEY

On November 6, the day his trial began, defendant made an oral motion for a bar association attorney to replace his public defender. Defendant contended that he had not been properly assisted in his case, primarily because his counsel had not spoken with him except in court. The public defender stated that he had spoken with defendant at the jail with regard to motions and intended to speak with him again before trial. The judge denied defendant's motion for a new attorney.

## TRIAL COMMENCES

Defendant waived his right to a jury trial and his trial took place on March 6, 1990, March 28 and April 9. Defendant's neighbor, Lester Burson, was the first witness. Burson testified that he knew the defendant by the name "Solo." He testified that, at about 5 a.m. on December 8, he heard Solo hollering in the apartment above his. He heard other noises and the yelling went on for about an hour. He testified that, at about 7:30 a.m., Solo came to his door to borrow a test tube. He heard more shouting, including the defendant cursing and saying something about being tired of something and not giving a shit. He testified that he heard two voices during that time, defendant's and a softer voice.

He testified that around noon another neighbor came to his door and asked him if something was burning. Burson was the building's

janitor and manager. He testified that he smelled "a funny thing" and went to the basement to see if something was on fire but found no fire.

He testified that later in the day he saw defendant in the hall and defendant said he wanted to talk later. Burson testified that he saw defendant later in the day, after school was out, and that defendant said "something about this world fucking messed up or something like that. *** He messed his world up or something like that."

He testified that defendant came to his home at about 6 or 6:30 p.m. and seemed upset. The defendant told him he had come home earlier and found his "old lady" dead. Burson testified that Solo threw the keys across the kitchen table and told him and one of his daughters, Keisha, to go look themselves at his dead wife. Burson testified that Solo passed out at the table. Burson's wife, Laverne, was there also, having just returned from the grocer. Many police officers arrived a short time later and they placed defendant under arrest.

On cross-examination Burson admitted that he and his wife were also arguing in the early morning hours of December 8. He agreed that he could have been hearing three different voices from defendant's apartment, including a voice from another woman who sometimes lived there. He admitted to being convicted of theft and burglary and to prior use of cocaine.

Laverne Burks, Lester's wife, testified that she heard arguing coming from defendant and Kim Blanchard's apartment for about two or three hours on December 8. She testified that she heard a man's voice at one point and that she did hear another noise sometime before her kids went to school. She testified: "Well I heard a thump. It got quiet and it was a high sound, just hit the floor real solid. I jumped up. My kids say, 'You heard that?' I say, 'Yes.' We didn't pay no more attention."

She testified that on her way back from a store after the kids had gone to school she heard the defendant shouting, "You bitch, I told you you could. *** You motherfucker, he kept saying it." She testified that she heard no other voice respond but she assumed he was arguing with Blanchard.

She testified that around noon a neighbor came to the door to pay rent and when the door was opened she smelled something she had never smelled before. The neighbor asked if something was burning but Burks replied "No."

She testified that later in the afternoon she returned home with groceries and found the defendant at her kitchen table "banging on the table and crying." He told her he had come home and found Blan-

chard dead. He told her she died after being burned while freebasing. He told her he had not touched her and said, "If you don't believe me, go upstairs and see." He was crying and he said "You all could help me." But Burks testified that she left the apartment and phoned the police.

On cross-examination she admitted that she had heard a scream around noon or 1 p.m. on December 8 but she denied that it was specifically a woman's scream, stating that it was like a screeching scream made out of frustration.

Eleven-year-old Keisha Burks testified that in the early morning hours of December 8, before school, she heard a loud noise above the front room where she was with her brother. She described the noise as something heavy which had fallen on the floor. She testified that she and her brother heard another loud noise and then heard the defendant screaming "fucking bitch" and "why are you doing this." She heard no reply.

She said she went to school shortly after and when she came home she took a rest on the couch in the living room. She testified that at about 6:30 p.m. she helped her mother take groceries out of the car. She found the defendant in the kitchen drinking and banging his head against the table. He said twice that he had killed his wife. She testified that when her father came in she took him to the living room to talk to him.

On cross-examination she admitted that the defendant did not say he had hit his wife or murdered her. She testified that after she spoke with her father he told her to go to her aunt's house.

Rosemary Fanaras, who lived in the apartment above the defendant, testified that from around 3 a.m. to 5 a.m. on December 8 she heard the defendant and Blanchard arguing. The only words she could make out were the defendant's who said, "No woman does this to me." At one point she heard the bathtub water running and she could also hear "thumping," like someone hitting a wall or falling against a wall. She testified that by the time she went back to bed around 5 a.m. the fighting had subsided.

On cross-examination she denied telling the police officers that she heard any yelling, banging, noises or thumping at 8:30 or 9:30 a.m.

Officer Vincent J. Krocka testified that he and his partner, Dennis Drygal, went to defendant's building around 8 or 8:30 p.m. on December 8 and went inside the first-floor apartment where defendant was sitting at a table with his head down. He testified that defendant was apparently drinking or high and was kind of passed out. He testified

that, after taking a key from defendant's pocket, he and his partner went upstairs to the second-floor apartment and found a black woman, naked and partially burned, lying on a bedroom floor. He testified that he immediately returned to the first-floor apartment and put handcuffs on the defendant. On cross-examination he testified that the defendant appeared to be heavily intoxicated at the time of his arrest.

Officer John Santopadre testified that he and his partner, Joseph Mohan, went to defendant's apartment December 8 and observed the dead woman, Kim Blanchard. He identified several pictures taken at the scene, including one that showed a mark on one of the walls which he identified as blood. He testified that the bathroom tub had water in it and the floor appeared to have just been washed. A pair of cut-up pants were in the garbage can in the kitchen.

Santopadre testified that he and Mohan interviewed defendant at about 11 p.m. that evening after Mohan read defendant his *Miranda* rights from a preprinted card. Defendant told the officers that Blanchard had come home at about 4 a.m. on December 8 and went into the bathroom. He said he heard a loud noise and a scream and when he went into the bathroom he found Blanchard on fire. He testified that he wrapped her in a blanket to put the flames out but a short time later she died. He told the officers that he did not call police right away because he wanted to go out and get high or drunk.

Santopadre testified that he and his partner spoke with the defendant again the next evening, December 9, after he read the defendant his *Miranda* rights from a preprinted card. The defendant recounted his version of how Blanchard had died, volunteering as an explanation for the bruises on her body that she was a prostitute and a trick must have beaten her up.

He testified that Kinnerk arrived and defendant again spoke after waiving his *Miranda* rights. Santopadre testified that when defendant gave his second statement on December 9 he added additional facts, including that Blanchard had called at about 4 a.m. December 8 to tell him she was bringing a trick home. He told the officers and assistant State's Attorney that he left their home and when he called home an hour later Blanchard said the trick was gone but that he had beaten her up. Santopadre testified that the defendant explained how he had come home and argued with Blanchard about bringing a trick home. He told the officers he had argued also about how much money she had made and he admitted beating her several times with his fists.

On cross-examination he admitted that he did not know if the mark on the wall was blood. He admitted that he did not include in

his report that the defendant hit Blanchard with his fists. He testified that, when he first saw the defendant at approximately 11 p.m. on December 8, the defendant appeared to have been drinking but he was coherent.

On the second day of trial, the prosecutor told the judge that he intended to call Officer O'Meara as a witness and that O'Meara had additional reports that the prosecutor did not realize existed until that very morning. The officer's report was given to the defense attorney, who moved to re-open the motion to suppress hearing based on new information. The defense attorney stated that the new report indicated that when police tried to give defendant his *Miranda* rights such "attempts *** were to no avail." The court agreed to hear arguments on the motion at a later date after defendant's counsel was permitted to make an offer of proof.

Dr. Shaku Teas, from the Cook County medical examiner's office, testified about an autopsy she had done on Blanchard. She authenticated several photos of Blanchard's body and explained that Blanchard had multiple bruises and internal hemorrhaging from head to toe and fractures on several ribs and bones. She testified that the burn marks on Blanchard's body were consistent with burns that would occur after someone had died and a flammable liquid was poured on her body. She testified that Blanchard's blood tested positive for cocaine and another cocaine by-product. She testified that in her opinion Blanchard did not die of carbon monoxide inhalation but instead died from multiple blunt force injuries.

On cross-examination Teas denied that a person could die from a fire and not show some carbon monoxide in the blood and soot in the trachea. She conceded that the other injuries to Blanchard besides the burns could have occurred in the 24-hour period before Blanchard's death.

Officer Timothy O'Meara, an arson investigator, testified that he and his partner went to defendant's home December 8 at approximately 9 p.m. He testified that the burn patterns on Blanchard's body indicated that a flammable liquid was poured on her body because there were no combustible materials on her body such as clothing or paper. He said the burn marks on her body appeared to him to show a pattern indicating that a flammable liquid was poured on her body and dripped down by the force of gravity. He testified that no burn marks appeared on her hands or her face, including facial hair and nasal cavity. He testified that if there was an explosion while she was alive, Blanchard would have breathed in hot gas or flames and she would have burned her eyelashes and eyebrows. He testified that he

believed the burns occurred while Blanchard's body was lying on her back. He testified that the room showed no evidence that a fire occurred or that pieces of glass flew around the room from an explosion. He testified that in his opinion the burns on Blanchard's body occurred after her death when a flammable liquid was poured on her and it was ignited. On cross-examination O'Meara admitted that he could not determine the degree of the burns. He testified that he believed alcohol is a clean-burning substance.

The defendant's motion for a directed finding was denied.

## RENEWED MOTION TO SUPPRESS

At this point the defense renewed its motion to suppress defendant's oral statements and three-page statement, as written out by Assistant State's Attorney Kinnerk. Defense counsel argued that the newly discovered police report by the arson investigator, O'Meara, indicated that the arresting officers told O'Meara they attempted to interview the defendant at the scene after they gave him his *Miranda* rights but they were not able to interview him because of his condition. Defense counsel argued that the report indicated that defendant refused to provide information to the officers, a right under the fifth amendment. Defense counsel argues that was further evidence that the defendant was not able to appreciate the meaning of the *Miranda* rights and could not have knowingly and intelligently waived his right.

The State objected to the reconsideration of the motion to suppress, arguing that O'Meara's report simply related what the arresting officers had told him. The State argued that the defense had full access to the arresting officers and disclosure of the arresting officers' reports prior to trial. In addition, the State argued that the first of the four statements by defendant was given to police approximately three hours after his arrest. The State argued that O'Meara's report offered no new information and therefore the defendant's motion should be denied.

In ruling, the trial judge stated that the arresting officers testified at the suppression hearing and defense counsel had an opportunity to cross-examine them with regard to the defendant's condition. The judge found the additional information cumulative and denied defendant's motion to reconsider his ruling on the suppression of defendant's statements.

## RENEWED MOTION FOR NEW COUNSEL

Before the defense put on its case, the defendant asked the court

if he could represent himself. He informed the court that he had filed a complaint against his attorney with the Attorney Registration and Disciplinary Commission (ARDC) two weeks before the trial began. The trial judge ordered defense counsel to present written motions for defendant's requests for exhumation of Blanchard's body and an additional expert witness pathologist. The court stated that it would consider those motions in 10 days, April 9, along with defendant's motion for a new attorney.

On April 9 the court considered the motions prepared for defendant. Defense counsel acknowledged receipt of a letter from the ARDC on March 24, after the trial began, which stated that no further action would be taken on defendant's complaint. The trial judge denied the defendant's motions to exhume the body and to appoint an expert witness.

The judge denied defendant's motion to appoint substitute or additional defense counsel, noting that the motion was made after the State had rested its case in chief.

### TRIAL IS COMPLETED

Officer Bogucki was the only witness to testify for the defense. Bogucki testified that he was at defendant's residence on December 8 and interviewed Rose Fanaras, a neighbor who lived a floor above defendant. He testified that she told him she heard no noise coming from defendant's apartment between 3:30 and 5 a.m. but she did hear arguing and thumping on the walls off and on between 5 and 9:30 a.m.

The parties stipulated that if another doctor from the medical examiner's office was called he would testify that a toxicology report on Blanchard's blood showed the presence of cocaine and a cocaine byproduct.

After closing arguments the trial judge found defendant guilty of first degree murder. Defendant was sentenced to 25 years in prison and appeals.

Initially we consider whether the indictment was properly amended prior to trial. Before the trial began, the court permitted the State to amend the indictment against defendant to omit the word "fists" from the charged offenses. Defendant contends that the amendment was a material alteration to the charges against him and therefore the change was not a mere formality. Statute provides that an indictment may be amended by motion by the State's Attorney or defendant at anytime because of formal defects, including the pres-

ence of any unnecessary allegation. Ill. Rev. Stat. 1989, ch. 38, par. 111–5.

Defendant alleges that the change was material because the initial indictment required proof beyond a reasonable doubt that defendant not only caused Blanchard's death, but also caused her death by his fists.

■ Defendant admits that he did not object to the amendment at the time of trial and therefore generally his objection to the State's amendment would be waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) Defendant argues, however, that since he is claiming ineffective assistance of counsel, such a waiver cannot be assumed to be trial strategy. We reject this contention, however, and rely on *People v. Jones* (1987), 162 Ill. App. 3d 487, 491, 515 N.E.2d 471, where the court found that a similar amendment was permissible where the defendant was adequately advised of the charges against him.

An indictment may not be broadened by amendment except by the grand jury in order to protect individuals from being prosecuted for a different offense than the one charged. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 124, 429 N.E.2d 508.) We agree with the State, however, that in this case the amendment to defendant's indictment was formal in nature and permissible because it did not change or broaden the scope of the offense charged. *People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1027, 486 N.E.2d 1297.

We find defendant was apprised of the charges against him from the outset and was not prejudiced or surprised by the amendment so as to warrant reversal. (*People v. McBrien* (1986), 144 Ill. App. 3d 489, 495, 494 N.E.2d 732.) We find no error in permitting the amendment to the indictment.

Next we consider whether the State violated its duty to tender discovery prior to trial. Defendant contends that the State failed to comply with Supreme Court Rule 412(f), which requires that the State disclose, upon request by defendant, all material and information relevant to the accused and the offense charged, ensuring that a sufficient flow of information is maintained between the various investigative personnel and its office. 107 Ill. 2d R. 412(f).

Defendant contends that the State's failure to timely tender Officer O'Meara's police report was a violation of the discovery rule because the prosecutor should have determined O'Meara's report existed and then turned it over to the defense. Defendant argues that its preparation for the hearing on the motion to suppress would have

been "more thorough" and notes that O'Meara was listed on the State's potential witness list.

The State argues that any information in O'Meara's report was cumulative and therefore its omission was nonprejudicial to defendant. O'Meara's report was based on information told to him by the two arresting officers, the same officers who testified at the suppression hearing. The State contends that the evidence against defendant is overwhelming and that this cumulative evidence would not have altered the outcome of the trial.

The suppressed evidence must be unknown to the defense and that omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt, whether or not the additional evidence is considered, there is no justification for a new trial. *People v. Bouska* (1983), 118 Ill. App. 3d 595, 600, 455 N.E.2d 257.

The State also argues that it never possessed the evidence in question. Defendant must establish that he requested the evidence in question and that the State possessed the evidence yet failed to disclose it. (*People v. House* (1990), 141 Ill. 2d 323, 387, 566 N.E.2d 259 (State under no duty to discover and disclose the nurse's notes).) Failure to make this showing ends the analysis, and there is no need to consider the favorability or materiality of the undisclosed evidence. *People v. Guest* (1986), 115 Ill. 2d 72, 87, 503 N.E.2d 255.

■■ The trial judge found the additional information from O'Meara was cumulative because the arresting officers testified at the suppression hearing and defense counsel had an opportunity to cross-examine them with regard to the defendant's condition. Although the State has a continuing obligation to disclose materials such as police reports prepared by officers who are expected to testify, we believe the suppression of this report was not a violation of defendant's due process rights because the evidence was not material or favorable to defendant's case. *Guest*, 115 Ill. 2d at 87.

Next we consider whether defendant effectively waived his *Miranda* rights and whether the trial judge erred in denying defendant's motion to suppress statements he made to police officers and an assistant State's Attorney.

Defendant contends that he did not knowingly and intelligently waive his *Miranda* rights and that, therefore, the trial judge erred in denying his motion to suppress the three oral statements and one written statement by defendant. Defendant contends that his testimony was uncontradicted when he said he was jittery, drowsy and confused when he made the statements. Defendant contends that the trial judge did not consider this evidence when he determined that

defendant made a knowing, intelligent and voluntary waiver of his *Miranda* rights.

Defendant cites in support *People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958. The court in *Bernasco* analyzed when a waiver of *Miranda* rights is knowing and intelligent in situations where there is no police coercion but the defendant's mental ability or mental state is in question. The court in *Bernasco* stated:

> "If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings. It need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy; but to waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *Bernasco*, 138 Ill. 2d at 363.

Defendant contends that his drinking and drug use prior to his arrest affected his ability to waive his *Miranda* rights. He contends the trial judge failed to give proper consideration to this fact.

The State argues that intoxication cannot be used as a defense in this case. A person's statement will be suppressed on the ground of intoxication or drug use only if, when the statement was made, the person was so grossly intoxicated as to be incapacitated. Lesser degrees of intoxication or drug use go merely to the weight to be given to the confession. (*People v. Matthews* (1990), 205 Ill. App. 3d 371, 409, 562 N.E.2d 1113.) The State contends that defendant's testimony as to his level of intoxication does not rise to the level of incapacitation.

The State argues also that it is the defendant's burden to show that his waiver was not knowing, intelligent and voluntary once the State presents a *prima facie* case. (*People v. Smith* (1990), 199 Ill. App. 3d 839, 846, 557 N.E.2d 596.) A *prima facie* case of waiver is established if the State produces evidence that the defendant was properly admonished and that, after being admonished, he waived his right to assistance of counsel. *Smith*, 199 Ill. App. 3d at 846.

■ We find the State presented *prima facie* evidence of defendant's knowing and intelligent waiver and that defendant failed to rebut that evidence. Though it is true that defendant was passed out and had to be awakened at the time of his arrest, defendant's first statement to police came three hours after his arrest. Subsequent statements were given more than 24 hours after his arrest and after he had been fed and slept. At the suppression hearing, two officers

and the assistant State's Attorney all testified that defendant appeared lucid and responded properly to questioning. All three testified that they read defendant his *Miranda* rights and that defendant acknowledged those rights and indicated that he wanted to talk. A reviewing court will not disturb the ruling of a trial court on a motion to suppress unless the decision is against the manifest weight of the evidence. (*People v. Booker* (1991), 209 Ill. App. 3d 384, 391, 568 N.E.2d 211.) We find the trial judge's decision not to suppress the statements was not against the manifest weight of the evidence.

Defendant poses three interdependent questions which encompass his claim of ineffective assistance of counsel: (1) whether the trial judge erred in denying the appellant's motion for substitution of counsel; (2) whether defendant's trial counsel properly assisted defendant with his burden of production; and (3) whether defendant and his court-appointed attorney had a conflict of interest prior to the commencement of trial.

Defendant argues that a conflict existed between him and his attorney as soon as he expressed dissatisfaction with his counsel prior to trial. He said that conflict was further established when defendant and his counsel disagreed over the motion to exhume the body and the motion for an additional expert pathologist. Defendant contends the trial judge should have taken action before trial but erred in waiting until the final day of trial, April 9; a point where the court felt compelled to deny the motion and finish the trial.

In addition, defendant contends that his counsel's failure to obtain an expert on cocaine addiction to testify at the suppression hearing is evidence that his counsel failed to properly "develop" the relevant issues at his suppression hearing. Defendant cites to a magazine article about cocaine but that authority is not part of the trial record and is not properly before this court and thus had no relevance to this appeal.

The State argues that defendant made no showing of good cause for substitution of counsel and therefore he was not prejudiced by the court's denial of his pretrial motion for new counsel. The State contends that defense counsel's decision to call or not call for an expert witness and in filing a motion to exhume Blanchard's body were trial strategy and therefore not the proper subject for review on a claim of ineffective assistance of counsel. A court may refuse to appoint new counsel where a defendant's claim is spurious or is a matter of trial strategy or tactics. (*People v. Brandon* (1987), 157 Ill. App. 3d 835, 847, 510 N.E.2d 1005.) A trial court's decision will not be overturned

on appeal unless manifestly erroneous. *Brandon*, 157 Ill. App. 3d at 847.

Finally, defendant contends that when his trial counsel failed to raise the issue of ineffective assistance of counsel in the motion for a new trial, "the appointment of independent counsel was mandated." Defendant cites in support *People v. Washington* (1989), 184 Ill. App. 3d 703, 540 N.E.2d 1014, and *People v. Harris* (1990), 195 Ill. App. 3d 507, 552 N.E.2d 1078, which review when the trial judge should appoint independent counsel to consider a defendant's post-trial claim of ineffective assistance of counsel. Both cases rely on *People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466, and/or *People v. Krankel* (1984), 102 Ill. 2d 181, 189, 464 N.E.2d 1045, for support.

The court in *Jackson*, relying on *Krankel* and *People v. Johnson* (1981), 98 Ill. App. 3d 228, 424 N.E.2d 610, explained how a court should handle defendant's post-trial motion claiming ineffective assistance of counsel:

> "The trial court should examine the factual matters underlying the defendant's claim. *** If the claim goes to matters of trial tactics or strategy, the defendant's claim should be found spurious and his request for new counsel denied. This was the case in *Johnson*. If, however, the factual matters show possible neglect of the defendant's case, the court should appoint new counsel who can undertake an independent evaluation of the defendant's claim and present the matter to the court from a detached, yet adversarial, position. This was the case in *Krankel*, where defendant alleged that his attorney failed to interview an alibi witness." *Jackson*, 131 Ill. App. 3d at 139.

Though the opinion was published in the middle of defendant's trial in this case, the Illinois Supreme Court has approved of the *Jackson* court's interpretation of *Krankel* in *People v. Nitz* (1991), 143 Ill. 2d 82, 572 N.E.2d 895, and more recently in *People v. Williams* (1991), 147 Ill. 2d 173, 250-51. In *Williams* the court stated that a *pro se* motion for a new trial alleging ineffective assistance of counsel does not *per se* require appointment of new counsel. The court noted that "[o]nly if the allegations show possible neglect of the case *** should new counsel be appointed." *Williams*, 147 Ill. 2d at 251.

■ In defendant's case, defendant has not made allegations that would establish "possible neglect" of his case by defense counsel as required under a *Williams* standard. Before trial, defendant moved for new counsel because he believed his counsel had not consulted with him enough. The defense attorney, however, stated that he had spoken to his client. The court denied defendant's request for new

counsel. A second request for new counsel came at the close of the State's case when defendant was angered that his counsel would not offer his two motions to the court. The court denied that motion too after considering defendant's two motions filed *pro se*. Defendant has offered no explanation why the exhumation would benefit his case. Defendant has not indicated any other facts to indicate a "possible neglect" of his case which would warrant appointment of new counsel under the standards articulated in *Williams*.

The State contends that defendant's claim should be analyzed under the standards established in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. In *Strickland* the court stated that, in order to establish ineffective assistance of counsel, a defendant must show that his counsel's performance was so deficient that it fell below an objective standard of reasonableness and that the performance prejudiced the defense of the case. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) The *Strickland* standard was adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.

■ The record establishes defense counsel provided effective representation under the standards articulated in *Strickland*. Defense counsel moved to suppress statements defendant made before trial. When O'Meara's report was obtained during trial, defense counsel moved to reopen the motion to suppress. At trial, defense counsel aggressively cross-examined the State's witnesses. Defense counsel's decision not to file motions seeking an expert pathologist and an order exhuming the body appears to be trial strategy. Defense counsel is not required to make futile motions or objections in order to provide effective assistance. (*People v. Smith* (1988), 172 Ill. App. 3d 94, 111, 526 N.E.2d 849.) Under a *Strickland* standard, defendant has presented no evidence to establish that his counsel's conduct was so deficient that it fell below an objective standard of reasonableness. We find defendant received effective assistance of counsel.

Finally we consider whether the trial judge erred in denying defendant's motion for an expert witness.

After the trial judge denied defendant's motion for a directed verdict, he then denied defendant's *pro se* motion for a pathologist. Defendant had challenged Dr. Teas' qualifications and her results on the autopsy she performed. The trial judge found Teas qualified to testify as an expert. Defendant contends that when he, as an indigent defendant, contests the cause of death in a murder trial, "due process of law requires that he have the benefit of expert testimony." To support this argument, defendant cites to *Williams v. Martin* (4th Cir.

1980), 618 F. 2d 1021, 1026 (Equal protection clause requires the government to provide an indigent defendant with the assistance of an expert when a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance).

The State contends that the trial judge's ruling was proper because the defendant did not demonstrate diligence in procuring the expert and did not offer proof of the expert's anticipated testimony. The State argues further that the testimony of another pathologist would have been cumulative. Finally, the State argues that it presented overwhelming evidence of defendant's guilt at trial and the testimony of the expert would not have affected the outcome of the trial.

Granting or denying a continuance to locate a witness is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. (*People v. Amos* (1990), 204 Ill. App. 3d 75, 83, 561 N.E.2d 1107.) The denial of a motion to continue is not an abuse of discretion where the anticipated testimony would be confined to collateral matters and would not have affected the outcome of the trial. *People v. Watts* (1990), 195 Ill. App. 3d 899, 917, 552 N.E.2d 1048.

We find defendant has not offered evidence to establish that another pathologist would have provided conflicting evidence at trial. Defendant's challenge to Teas' credentials does not go to the question of how Blanchard died but instead goes to whether the court will accept Teas as an expert witness. Again defendant has offered this court no reason why another pathologist would testify differently. We find no abuse of discretion by the trial court and therefore affirm the trial court's denial of defendant's motion for an expert witness.

Therefore, we affirm defendant's conviction for first degree murder and his sentence of 25 years.

Affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.