2022 IL App (2d) 191123-U
No. 2-19-1123
Order filed June 13, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE, OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-1057 |
| ARTURO HERNANDEZ-PEDRAZA, | ) ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in admitting evidence of defendant's church censure, the complaining witness's testimony, or the State's comments during opening and closing argument, and there was sufficient evidence to prove the same offense occurred on multiple occasions, therefore the convictions on count II and III did not violate the one-act one-crime doctrine.

¶ 2    After a jury trial, defendant, Arturo Hernandez-Pedraza, was found guilty of 14 sex offenses involving his daughter, C.H., and was sentenced to 50 years in prison. On appeal, defendant contends that he received ineffective assistance of counsel on the following grounds: (1) failure to object to evidence of a public "reproof" that happened in defendant's religious

organization; (2) failure to object to comments made by the prosecution during the State's opening and closing arguments; and (3) failure to object to witness testimony that amounted to hearsay. Defendant additionally contends that there was a violation of the one-act one-crime doctrine because the alleged offenses in counts II and III were not proven to be based on two separate offenses, and that either one of the convictions should be vacated. We affirm.

¶ 3                              I. BACKGROUND

¶ 4     Defendant was charged by indictment with 14 sex crimes; because these crimes spanned most of C.H.'s young life, defendant was charged under different versions of the Criminal Code applicable to the relevant time frame. Accordingly, defendant was charged with one count of aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 2004)) for touching C.H.'s buttocks and body; three counts of predatory criminal sexual assault (720 ILCS 5/12-14.1(a)(1) (West 2006)) (renumbered as 720 ILCS 5/11-1.40(a)(1) by Pub. Act 96-1551, art. 2, § 5 (eff. July 1, 2011)) for placing his penis in C.H.'s anus; four counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2012)) for placing his penis in C.H.'s anus, his penis in C.H.'s vagina, his mouth and tongue in C.H.'s vagina, and his finger in C.H.'s vagina; two counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 2004)) (renumbered as 720 ILCS 5/11.160(b) by Pub. Act 96-1551 art. 2, § 5 (eff. July 1, 2011) for placing his hands on C.H.'s breasts, and placing C.H.'s hand on his penis; three counts of sexual relations within families (720 ILCS 5/11-11(a) (West 2018)) for placing his penis in C.H.'s vagina, and placing his tongue and mouth in C.H.'s vagina; and one count of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2018)) for kissing and touching C.H.'s face and neck.

¶ 5     Prior to the trial, the court held a hearing on the State's motion to introduce out-of-court statements made by C.H. when she was a minor pursuant to section 115-10 of the Code of Criminal

Procedure (725 ILCS 5/115-10 (West 2018)). The statement was that, in 2006, C.H. told her mother, Eloina Hernandez, that defendant had touched C.H. on her private parts. The trial court found that the statement was admissible.

¶ 6 At trial, C.H., testified that on October 19, 2018, she disclosed to elders in her church, the Kingdom Hall of Jehovah's Witnesses, that she was sexually assaulted and abused by defendant. The elders notified the Crystal Lake police, and C.H. initially told the allegations to police while she was at the church. She then went to the Crystal Lake police station where she recounted to Detective David Eitel various sex offenses that defendant had committed against her beginning when she was 6 years old in 2005 through when she was 18 in 2018.

¶ 7 C.H. testified that when she was 6 years old, she approached Eloina and told her what the defendant was touching her private parts. C.H. did not remember this conversation in detail, but she remembered that Eloina went to the church elders, and for a short amount of time defendant ceased the abuse.

¶ 8 However, the abuse resumed. C.H. testified that from the period of October 19, 2005, to October 18, 2017, when she was 6 to 17 years old, defendant touched her buttocks, breasts, lower pelvic area, and vagina with his hands on a regular basis. Defendant would kiss C.H. on her body and kissed her mouth. Additionally, defendant would grab C.H.'s hand and put it on his penis. C.H. testified that the touching happened as frequently as multiple times a month, to on a weekly basis, throughout these 12 years, and would often occur in defendant's marital bed. The abuse always occurred in the residence of the family. The abuse began when the family lived in the basement level of a home on Cambridge Lane, then the upstairs level of the same home, and then later an apartment on Terra Cotta Avenue.

¶ 9       From 2006 to 2011 when C.H. was 7 to 11 years old, she testified that defendant penetrated her by putting his penis in her anus while she was lying down on the bed and defendant would stand up over her or be on top of her. This type of penetration happened for many years. After C.H. turned 12 she testified that anal penetration occurred just a few times more. As she got older defendant began to penetrate her vaginally. From 2012 to 2017, when C.H. was age 13 through 17, defendant would place his tongue in C.H.'s vagina, his fingers in C.H.'s vagina, and his penis in C.H.'s vagina.

¶ 10      After C.H. turned 18, the abuse continued. On October 6, 2018, two weeks before she turned 19, C.H. returned home to the family apartment to change out of her work clothes before attending a family gathering at a family friend's home in Crystal Lake. Shortly after C.H. arrived home, defendant also arrived at the apartment. Eventually, defendant removed C.H.'s pants while on the floor of the living room; he touched his penis to her vagina and attempted to put his penis inside her vagina. When he remarked that it "wasn't working" he then put his tongue in C.H.'s vagina. After this episode, defendant drove C.H. to the party.

¶ 11      On the morning of October 15, 2018, defendant and C.H. were the only two people in the family apartment. C.H. was sleeping in her loft bed, in the bedroom she shared with her sibling. Defendant approached the room while C.H. was still sleeping and shook the bed to wake her. C.H. told defendant to leave her alone. Defendant climbed up the bed and got on top of C.H. and started kissing her on the torso and on her face. Defendant threatened C.H. not to tell anyone because if she did, he would kill her family, which would include her mother and brother.

¶ 12      C.H. testified that defendant initiated their sexual encounters by either coming up behind her or by taking her into the primary bedroom where he would lock the door. C.H. testified that if her sibling was home defendant would tell his son to go to his room or otherwise distract him.

¶ 13    C.H. testified that on at least one occasion defendant had her take a pregnancy test at a pharmacy. Defendant also provided C.H. with condoms to conceal in her bedroom closet. On at least one occasion, defendant gave C.H. several small white pills; defendant never explained what they were and C.H. never consumed them. C.H. testified that she told two friends about defendant's abuse the week before she spoke to the police.

¶ 14    Eloina Hernandez, defendant's wife, testified that she has been in a relationship with defendant for 25 years. In 2006 Eloina noticed that C.H. had wet the bed a few days in a row. This new behavior worried her, and she had a conversation with C.H. about it one day before school. Eloina testified that during this conversation she asked C.H. if someone was touching her. C.H. responded that defendant was touching her and C.H. gestured to her vagina. Eloina was very upset about the situation. Later that day, when defendant arrived home from work, Eloina confronted defendant about the abuse. Eloina testified that defendant put his head down and "looked like he was embarrassed." Eloina told defendant that his behavior was a very big sin and that the church elders needed to know about it. She told defendant that either he had to say something to the elders, or she would.

¶ 15    Eloina and defendant went to the Kingdom Hall of Jehovah's Witnesses in Crystal Lake, where they were members of the congregation, and had a discussion with the church elders. At one point, Eloina left the room and defendant spoke with the elders alone. Eloina testified that after the conversation defendant was censured publicly and he was not allowed to have any privileges. According to Eloina, a "censure" in their church is a procedure that demonstrates that a person has acknowledged his or her sin and repented to the elders. The censure is concluded with a public announcement of the sin to the congregation. On the way home from church that day, defendant

asked Eloina to forgive him for what had happened. After that day, Eloina and defendant never spoke of the matter again, and she never told anyone else what C.H. had disclosed to her.

¶ 16    Eloina testified that on October 6, 2018, she went with her husband and son to a family friend's house for a get-together. C.H. was working that day and was going to drive herself. Eloina did not see defendant leave the party but realized that he left before dinner was served. Eloina called defendant to say the food was ready and he told her he went home to get C.H. Eloina testified that defendant was gone for approximately 30 minutes and when he returned, C.H. was with him.

¶ 17    A.H. is the younger brother of C.H. A.H's testimony established when the family moved from the basement to the upper level of the house on Cambridge Lane, and when the family moved to the apartment on Terra Cotta Avenue.

¶ 18    A.H. testified that C.H. graduated high school in 2018, but when she was in high school, she would return home in the afternoon, and the two of them would talk, play games, or watch a movie together. A.H.'s mother, Eloina, worked in Cary and was not home C.H. and A.H. got home from school. Defendant would at times be home after school if his work schedule allowed. A.H. testified that sometimes C.H. and defendant would be alone together in different parts of the residence, including the primary bedroom, and that he was not in the room with defendant and C.H. when they were alone.

¶ 19    Monica Angon, defendant's sister, testified that she has been a member of the Jehovah's Witnesses since 2003. Angon described the censure procedure as when a baptized Jehovah's Witness does something bad, he or she speaks to the church elders in a private meeting, says what was done, and if the sinner shows remorse they will be censured. Then an announcement will be made publicly to the congregation. Angon testified that censures happened at the church "not

frequently." Angon stated that defendant received a censure at Kingdom Hall at some time after 2003 but she did not know what the reason was.

¶ 20   Michael Penkava, who holds a position of elder at the Kingdom Hall in Crystal Lake, testified to what a censure, which may also be called a "public reproof," entails:

"Q. What does it mean to be publicly reproved?

A. Public reproof is when an individual has committed a particular sin, has repented of that sin, and the -- the sin is known in the congregation. So an announcement of public reproof would let all who know of that sin understand that that individual has been scripturally helped to overcome the sin, reject that course, and determine to avoid that sin in the future.

* * *

Q. Is censure a common practice in the Kingdom Hall of Jehovah's Witness?

A. It is not common. It does happen at times when ones are involved in a serious sin that violates scriptural principles and that -- that are needed to be addressed by the elders. So sometimes that happens. And sometimes ones need to be readjusted and helped to repentance."

¶ 21   Penkava testified that in July 2006 a church elder, Alfonso Maicha, called a meeting of the elders to discuss a situation regarding a member of the congregation. Later, the elders held a meeting with defendant to help him spiritually. Then, a meeting was held with the elders and Eloina to inform her of her right to contact the authorities regarding what defendant had disclosed and to offer her spiritual counsel and guidance.

¶ 22   Penkava testified that defendant was publicly reproved. After the reproval, defendant lost certain privileges within the church such as handling the microphone during the question-and-

answer period of a meeting, directing any type of activity, and any "departmental privileges." Penkava also testified that the church elders talked to the heads of families with children and advised them not to let their children be alone in defendant's presence.

¶ 23 During Penkava's testimony, he invoked the clergy-penitent privilege (735 ILCS 5/8-803 (West 2018)). The jury was excused while the court considered whether this privilege could be invoked at all, and to what extent. The court found that the clergy-penitent privilege was properly asserted as to what was discussed in the meeting between defendant and the elders, as Eloina was not present and there was an inherent expectation of confidentiality. With respect to the censure, the court found that the fact that the public reproval took place was not protected by the clergy-penitent privilege, particularly as it was announced to the "public" of the congregation *en masse*.

¶ 24 The defense rested without presenting any evidence. After closing arguments, the jury found defendant guilty on each of the 14 counts.

¶ 25 The trial court sentenced defendant to three consecutive seven-year terms for predatory criminal sexual assault, followed by four consecutive six-year terms for criminal sexual assault, consecutive to two five-year terms for aggravated criminal sexual abuse, consecutive to three three-year terms for sexual relations with a family member—or an aggregate 50-year sentence. Defendant timely appealed.

¶ 26                                        II. ANALYSIS

¶ 27 As noted, defendant contends that he received ineffective assistance of trial counsel (see *Strickland v. Washington*, 466 U.S. 668 (1984)), and that his convictions on count II and III for predatory criminal sexual assault were predicated on the same physical act, thereby violating the one-act one-crime doctrine. We address defendant's arguments in turn.

¶ 28    Under *Strickland* defendants must prove: (1) that their defense counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's substandard performance, the result of the proceedings would have been different. *People v. Alvine,* 173 Ill. 2d 273, 293 (1996).

¶ 29    Defendant first contends that trial counsel was ineffective for failing to object to testimony by Eloina, Angon, and Penkava that defendant received a public reproval in the Crystal Lake Kingdom Hall in 2006. Defendant contends that this testimony indicated only that defendant sought repentance for a "serious sin" but that the jury was never specifically told what defendant was reproved for. According to defendant, evidence about what constitutes a censure or public reproval was inadmissible because it was irrelevant. We disagree.

¶ 30    Relevant evidence is that which tends to make any material fact more or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). In addition, the evidence must be more probative than unfairly prejudicial to be admitted. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 31    We determine that the evidence regarding the censure process generally was sufficiently relevant and probative to qualify for admission. As Professor Graham notes, "evidence that is essentially background in nature offered as an aid to understanding may be admitted even if [it is] not disputed." M. Graham, HANDBOOK OF ILLINOIS EVIDENCE, § 401.1, *179 (2018 ed.). Here, if the jury had not heard the testimony of Eloina, Angon, and Penkava, about the nature of the public reproval process the jury would have had no context for Eloina's testimony about bringing defendant to the church to speak with the elders, nor would the jury have any frame of reference for what the public reproval and censure process entails within defendant's and Eloina's religion. The evidence was not direct, but it was plainly demonstrative and was admissible on that ground. Thus, any objection to general testimony about the censure process would not have been

successful, and " 'counsel is not required to make futile *** objections.' " *People v. Smith*, 2014 IL App (1st) 103436, ¶ 64 (quoting *People v. Glass*, 232 Ill. App. 3d 136, 152 (1992)).

Similarly, we determine that the testimony about the censure of defendant was admissible on much of the same grounds. Evidence regarding a person's deeply held faith and religious practices may be admitted as relevant to clarify or explain what otherwise might be inexplicable. See, *e.g.*, *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 47 (noting that evidence regarding defendant's faith and his failure to attend services after victim was killed, which was unusual, was both relevant and admissible). Furthermore, Eloina's and Penkava's testimony about defendant's public censure tended to corroborate C.H.'s testimony about her disclosure to Eloina in 2006, and that Eloina and defendant jointly reported defendant's abuse of C.H. to the elders. Thus, the testimony about the reproval process and of defendant's censure specifically was relevant, it was properly admitted, and counsel cannot be said to have been ineffective for not objecting to it.

¶ 32    Secondly, defendant contends that trial counsel provided ineffective assistance in failing to object to C.H.'s testimony that she had previously told her friends what the defendant was doing to her. Defendant contends this was both inadmissible hearsay and an inadmissible prior consistent statement used to bolster C.H.'s trial testimony. Defendant also argues that the State made improper comments at both opening and closing statements essentially repeating this hearsay testimony of C.H.

¶ 33    We agree with defendant that C.H.'s statement was hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid 801(c) (eff. Jan. 1, 2011). The State asked C.H. whether she ever told anyone else about defendant's acts prior to the day she told the church elders. She replied, "I did tell a couple friends." The question that elicited this statement had to do broadly with understanding the timeline of events. To explain why C.H. got

the police involved in 2018, the State asked C.H. who called the police. C.H. explained she made a disclosure at church to the elders and then they notified the police. The State asked if she told anyone else and she replied she told a couple friends about a week before, but aside from that she had only told Eloina in 2006.

¶ 34    We agree with defendant that counsel should have objected to this testimony as inadmissible. That said, we disagree with defendant about the import of counsel's failure to object. Viewing the evidence as a whole, this one aspect of C.H.'s testimony did not seriously impact defendant's trial. The trial was largely based on C.H.'s recollection of defendant having sexually abused her for *years*, and the jury's verdict was necessarily based on its finding that C.H. was credible. If the jury had never heard the hearsay comment, the only information they would *not* have was that C.H. had told her friends about defendant's abuse *before* she told the police, which of course had nothing to do with the essential elements of the charges in this case. We determine that there was no reasonable probability that the jury would have acquitted defendant on any charge regardless of whether it heard C.H. testify "I did tell a couple friends." *People v. Warlick*, 302 Ill. App. 3d 595, 601 (1998) ("Erroneous admission of hearsay will not be held reversible if there is no reasonable probability the jury would have acquitted the defendant had the hearsay been excluded.").

¶ 35    In addition, we note that trial counsel demonstrated a sound reason *not* to object to this part of C.H.'s testimony. On cross-examination, defense counsel strategically revisited C.H.'s testimony about telling her friends, and implied that C.H. should have spoken to the authorities first rather than her friends. This was an objectively reasonable line of inquiry for counsel to explore and it was apparently one of the few avenues of impeachment available to the defense. In

any case, as we have determined that counsel's failure to object did not prejudice defendant, we reject defendant's second ineffective assistance claim.

¶ 36    Defendant also alleges that it was improper for the State in either opening or closing arguments, to rely on evidence concerning defendant's censure and C.H.'s statement that she reported defendant's abuse to her friends. Of course, parties are entitled to wide latitude in arguments when discussing the evidence and the inferences to be drawn from it. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. But more importantly, as we have explained, the evidence regarding defendant's censure was properly admitted, and even assuming C.H.'s statement about telling her friends should have been objected to as hearsay, the statement's admission was largely a nonevent—especially when compared to the gravity of C.H.'s statements about defendant's repeated sexual violations. In short, counsel was not ineffective and any errors in his trial were harmless.

¶ 37    Defendant's final contention is "that the language in the indictments, jury instructions, and verdict forms failed to distinguish the two alleged offenses in any way whatsoever" when it comes to counts II and III, resulting in a violation of the one-act one-crime doctrine. Under the rule in People v. King, 66 Ill. 2d 551 (1977), a defendant may not be twice punished for a single act. Defendant concedes that he failed to preserve this issue with a postsentencing motion, but asks that we review it as a structural error under the plain-error rule. We grant that request. See *People v. Artis,* 232 Ill. 2d 156, 165 (2009). An alleged violation of the one-act one-crime doctrine presents a question of law that we review *de novo*. *People v. Curtis*, 367 Ill. App. 3d 143, 147 (2006).

¶ 38    Defendant contends that the State did not adequately establish when the abuse alleged in count II and count III actually took place and therefore defendant could have been punished twice for only a single offense. Both count II and count III charged defendant with predatory criminal

sexual assault, penis-to-anus contact, between October 19, 2006, and October 18, 2011. Thus, defendant asserts that these convictions should have merged. We disagree.

¶ 39    The record, specifically defendant's indictment, indicates that the State intended to apportion the acts in counts II and III as distinct separate crimes, albeit crimes that occurred during the same period, which of course was within the State's discretion. See *People v. Crespo*, 203 Ill. 2d 335, 344-45 (2001). Beginning with opening arguments, and continuing throughout defendant's trial, the State presented consistent evidence that defendant committed an act of sexual penetration by placing his penis in C.H.'s anus at least twice when she was between the ages of 7 and 13. With respect to counts II and III specifically, C.H. clearly articulated that defendant's abuse was unrelenting when she was between the ages of 7 and 13; that defendant penetrated her "butt or anus" almost weekly, and C.H. told the jury "for many years that's how it was."

¶ 40    We are satisfied that the State differentiated between defendant's multiple sex offenses and that there was no possibility for juror confusion. Likewise, as the jury found defendant guilty of two distinct sex acts within the same time period, it was not error to sentence defendant on counts II and III consecutively.

¶ 41                                III. CONCLUSION

¶ 42    For the reasons stated, we affirm the judgment of the circuit court of McHenry County. Defendant did not receive ineffective assistance of counsel and he was not improperly sentenced under the one-act one-crime rule.

¶ 43    Affirmed.